Joseph L. TRUEBLOOD, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 79S00–9004–DP–00304.

Supreme Court of Indiana.

Feb. 28, 1992.

Rehearing Denied May 6, 1992.

Thomas J. O'Brien, Donahue, O'Brien & Morrissey, Michael J. O'Reilly, Lafayette, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

Joseph L. Trueblood pled guilty to three counts of murder. Ind.Code § 35–42–1–1(1) (West Supp.1991). The trial court sentenced him to death for these murders. We affirm.

In this direct appeal, Trueblood has raised two issues:

I. Whether the court erred in refusing to allow Trueblood to withdraw his guilty pleas, and

II. Whether the court failed to consider available mitigating circumstances and found an aggravating circumstance which was not supported by the evidence.

The facts most favorable to the judgment are as follows. Trueblood, a former boyfriend of Susan Bowsher, was upset with Susan because she was going to return to her ex-husband. He took a gun from his parents' house. A few days later on August 15, 1988, he picked up Susan and her two children, Ashlyn, age two and a half, and William, age seventeen months. While they were in his automobile Trueblood shot each of them in the head, killing all three. He then drove to his brother's home and borrowed a shovel. He took the victims to a secluded area and buried them in a shallow grave.

Trueblood pled guilty to the murder of Susan on October 6, 1988. On December 6, 1989, he filed a motion to withdraw his guilty plea, which the trial court denied. In February 1990, he went to trial on the charges of murdering the children. After several prosecution witnesses testified before the jury, Trueblood informed the court that he wanted to plead guilty to the murders of the children. The court took the plea and then discharged the jury. Within two or three days, Trueblood changed his story while giving his version of events to the probation officer for the pre-sentence investigation report. On March 2, 1990, he asked the court to allow him to withdraw the guilty pleas with respect to the children and proceed with a new trial. The trial court denied his request, expressly finding Trueblood was telling the truth when he pled guilty to the murders of the children and was not being truthful about the withdrawal of these pleas. The court subsequently heard evidence and argument relative to the imposition of the death penalty, and sentenced Trueblood to death for the three murders.

### I. Withdrawal of Guilty Pleas

Trueblood now asserts that Susan shot her children and then shot herself twice. He says he shot her a final time because she indicated she was in pain and wanted him to kill her. He cites this Court's decision in *Patton v. State* (1987), Ind., 517 N.E.2d 374, to support his argument that the trial court should have allowed him to withdraw his guilty pleas after he asserted he was innocent of the charges against him.

In Indiana's courts, "a judge may not accept a plea of guilty when the defendant both pleads guilty and maintains his innocence at the same time. To accept such a plea constitutes reversible error." *Ross v. State* (1983), Ind., 456 N.E.2d 420, 423. This rule is designed to heighten the reliability of the guilty plea. It also serves to prevent a practice which we believe would diminish respect for the court system: conviction and sentencing without trial of citizens who tell the judge they committed no crime. The *Ross* rule represents a policy decision made by this Court; it is not grounded in the eighth amendment or any other federal jurisprudence. *See North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (admission of guilt is not constitutional requisite to imposition of criminal penalty). The rule generally applies only to defendants who plead guilty and maintain their innocence at the same time. *Moredock v. State* (1989), Ind., 540 N.E.2d 1230; *Patton*, 517 N.E.2d 374.

In one capital case, however, we applied the *Ross* rule to a protestation of innocence which took place after the guilty plea was accepted. We held in *Patton*, 517 N.E.2d 374, that the trial court should set aside a guilty plea when the defendant denied at the sentencing hearing that he knowingly killed the victim. In *Patton* the defendant pled guilty to murder and to other charges. At the guilty plea hearing, the court read the information which alleged that Patton had knowingly killed the victim; Patton admitted these facts were true. The prosecutor read the probable cause affidavit, and Patton again acknowledged the facts were true. At the sentencing hearing, however, Patton maintained he did not intend to kill

the victim, and in fact did not know anyone was sitting in the car at which he shot. This Court reversed his murder conviction and death sentence and remanded for trial. *Id.*[1]

■ The case before us now poses anew the application of *Ross* in capital cases and places *Patton* in between two polar and facile approaches. At one extreme, *Ross* could be used to institute a per se rule that trial courts cannot accept guilty pleas in capital cases. A single emphatic sentence in *Patton*[2] has caused some to read *Patton* as doing just that. Defendants should have the option, however, to plead guilty if they so choose. They may want to do so for a multitude of reasons that may be favorable to them. The chance to present a case for life to the judge without running the risk of a jury recommendation for death is one such reason.

Alternatively, the *Ross* principles might be used to permit a defendant to plead guilty to a capital offense and withdraw the guilty plea at any time. This approach could create havoc. A defendant could go to trial, wait until substantial time, energy and resources have been invested in the trial, and decide to plead guilty. Then if he changed his mind again he would be allowed to withdraw his guilty plea, go to trial, and possibly decide to plead guilty again. The potential for this sort of manipulation makes this approach unacceptable. The rational approach lies between the two extremes, and both *Patton* and this case illustrate it well.

■ The most important consideration in applying the *Ross* rule to capital cases is the need for heightened reliability of the guilty determination. There can be no per se rule, however, to evaluate the reliability of these determinations. It is a decision that must be made upon the facts of each case. It almost goes without saying that a plea in a capital case must be more carefully and fully explored on the record with the defendant than a plea which subjects the defendant only to a term of years. A later request to withdraw such a plea calls for examining whether the plea was given truthfully and intelligently and whether the request to withdraw arises out of genuine misapprehension or out of a desire to manipulate.

*Patton* was a case in which the defendant chose to waive trial and take his chances with the judge on sentencing. The sole evidence of Patton's guilt came from his acknowledgments that the information and affidavit of probable cause were true. *Patton*, 517 N.E.2d at 374. It appeared that Patton had shot through a car window late one autumn night. The trial judge read Patton an information which alleged a knowing killing of the occupant and asked if he wanted to admit that the facts were true. Patton simply answered yes. At the later sentencing hearing, Patton testified that the windows were misted and that he had not seen anyone inside. It appeared possible to us that Patton never really believed he knowingly shot the victim. In light of the apparent strategy to contest "intentional" killing[3] and in view of the thin nature of the dialogue between the judge and the defendant, we were not satisfied that the defendant's plea to a knowing murder was reliable.

■ In this case, there is much more evidence of Trueblood's commission of the murders. He did not simply acknowledge the truth of the charging information and the probable cause affidavit. Trueblood responded affirmatively to individual and distinct questions about whether he knowingly killed Susan and the children by shooting bullets into their heads and

---

1. Upon subsequent trial, the jury recommended against the death penalty and the trial judge imposed a term of years. *State v. Patton,* No. CR83–232D (Marion Superior Court April 17, 1990).

2. "In Indiana we will not execute people who plead guilty and then protest innocence at their sentencing hearing." *Patton,* 517 N.E.2d at 376.

3. The death penalty aggravator in Patton's case was Ind.Code § 35–50–2–9(b)(1) (defendant committed the murder by intentionally killing victim while committing or attempting to commit another enumerated serious crime).

whether he intended to end their lives. Moreover, the circumstances of Trueblood's plea suggest a strategic decision to plea and a desire to manipulate.

Several days of the jury trial had taken place before Trueblood asked to plead guilty to the murders of the children. Four witnesses had given testimony damaging to Trueblood and were subject to cross-examination by his attorney before he decided to plead guilty.

Susan's former in-laws testified first. Mr. William Hughes testified that two weeks prior to the murder Susan and the children moved in with him, his wife, and son (Susan's ex-husband). He indicated Susan and his son were planning to get back together. William Hughes last saw Susan on the day of the murder. He testified that she was in good spirits when she left that day to go pay a deposit on an apartment. Mrs. Christine Hughes also testified that her son and Susan were going to get back together. Additionally, she related a story reflecting on Trueblood's temper: a few months after her son and Susan were divorced Trueblood followed her and Susan in his car and hit Christine's car with his several times.

The most damaging testimony was given by the next witness, Trueblood's twin brother William. William testified that Trueblood came to his apartment on August 14 or 15 and told him that he had "just shot Susan and the kids were dead." Record at 821. When asked who killed the children, Trueblood responded that he had killed them. Trueblood said he shot Susan first and then the kids, using motions to describe the manner in which he shot them. He told William he took the gun he used to kill Susan and the children from his father's lockbox. He threw the bullets and spent casings out the window as he drove down the road, and threw the gun in the river. Trueblood borrowed a shovel from William so he could bury the bodies, and returned to William's apartment for a shower after he buried them. He repeated this sequence of events the next day because he was afraid he originally buried the bodies in a grave that was too shallow.

Trueblood told William he shot the children because he was afraid the little girl would tell someone that he had hurt her mother. Trueblood stated it was easy to shoot Susan. Trueblood told William he killed Susan and the children because Susan did not want to be with him anymore. William told Trueblood that he was wrong for killing somebody just because they did not want to be with him, and Trueblood agreed. William testified that he was afraid for himself and his wife after Trueblood told him what had happened because he thought Trueblood was capable of killing them as well.

The fourth witness to testify for the State was Dr. Michael Clark, a forensic pathologist. He testified the little girl was shot once in the forehead, the little boy was shot once in the head, and Susan was shot three times in the head. One of Susan's wounds was a shot to her left cheek and the other two shots were to her head behind her ears. He further testified that it was uncommon for people to shoot themselves behind the ears in a suicide, in part because it is physically difficult to get the weapon in position and pull the trigger from behind the head. He also stated it would be very unusual for a person to attempt suicide by shooting herself in the cheek because that wound would not be immediately fatal and would be very painful. It was after the testimony of this fourth State's witness that Trueblood decided to plead guilty to the murders of the two children.

As can be seen from the above testimony, there was much more evidence of Trueblood's guilt in this case than was available in *Patton.* In addition to Trueblood's explicit admissions that he knowingly killed the three victims by shooting each in the head, there was testimony from witnesses supporting this version of events and tending to negate Trueblood's new story that Susan killed the children and shot herself. The trial court made an express finding that Trueblood was telling the truth when he pled guilty to the murders of the children and was not telling the truth when he attempted to withdraw those pleas. True-

blood apparently felt the trial was not going well for him and made a decision that it would be better for him to stand before the judge instead of the jury.[4] The guilty pleas in this case are more reliable than the guilty plea in *Patton*.

■ When a defendant moves to withdraw his guilty plea after its entry but before sentencing, the trial court's ruling on the motion is reviewable only for an abuse of discretion. Ind.Code § 35–35–1–4 (West 1986). We conclude that the trial court exercised appropriate discretion in denying Trueblood's motions to withdraw his guilty pleas.

### II. Death Sentence

Trueblood challenges his sentence on two grounds. First, he argues the trial court failed to consider properly presented mitigating circumstances. Second, he says the court found an aggravating factor which was unsupported by the evidence.

■ Trueblood maintains the trial court erred in failing to consider the statutory mitigating circumstance that he was acting under extreme mental and emotional strain at the time of the murders, and the non-statutory mitigating circumstances that his conduct in jail awaiting trial was good, that he was kind to children, and that he once performed an act of heroism.[5]

Under Ind.Code § 35–50–2–9(c)(2) (West Supp.1991), it is a mitigating circumstance if "[t]he defendant was under the influence of extreme mental or emotional disturbance when the murder was committed." Trueblood argues this mitigator was applicable to him because there was evidence he was suicidal and suffered from a mixed personality disorder with borderline and anti-social traits. The trial court expressly found Trueblood was not under the influence of any mental, physical or emotional disturbance when he committed the murders.

While his parents did testify that they heard Trueblood was suicidal at some time before the murders, this evidence does not compel a finding of extreme emotional disturbance. The psychologist who diagnosed Trueblood as suffering from a mixed personality disorder testified that Trueblood does not meet all the criteria of a borderline personality disorder or an anti-social personality disorder but that he meets some criteria of both disorders. He testified that some people with personality disorders do very well in society. He further stated Trueblood knew violent behavior was illegal. We cannot say the trial court erred in finding that Trueblood was not suffering from extreme mental or emotional disturbance when the murders were committed. *See Lowery v. State* (1989), Ind., 547 N.E.2d 1046 (no error in trial court's refusal to find extreme mental or emotional disturbance when evidence was in conflict as to degree of defendant's mental illness).

Trueblood further complains that the trial court did not consider three mitigating circumstances that were presented at the sentencing hearing. The evidence before the court, however, did not mandate these findings of mitigation.

■ Trueblood argues the court should have found that his good conduct in jail while awaiting trial was a mitigating circumstance. One officer from the jail testified he did not have any problems with Trueblood but acknowledged that he usually did not have problems with the jail inmates. Another officer stated Trueblood was more or less a good inmate, and that he had problems with Trueblood on only one or two occasions. Finally, a third officer stated he had only one problem with Trueblood. This evidence does not compel a finding of good behavior as mitigation.

■ Trueblood also contends the court should have found as a mitigating factor

---

4. At the hearing on Trueblood's motion to withdraw the guilty pleas to the children's murders, Trueblood stated he wanted to get rid of the jury because he did not think he was getting a fair trial. Record at 1184.

5. The trial court found the following mitigating factors: Trueblood had no significant history of prior criminal conduct; he was abused as a child; he at various times supported siblings and others financially and emotionally; and, he may adjust well to long-term imprisonment. Record at 1972.

that he was kind to children. There was evidence presented on his behalf that he was kind to children and would take care of them and buy them things. In light of the fact that Trueblood killed two children, his claim that he was kind to other children was probably not entitled to much weight. In any event, this evidence was reflected in the court's finding in mitigation that Trueblood at various times supported his siblings and others financially and emotionally.

He finally argues that the court should have found he had previously performed an act of heroism. His parents each testified that Trueblood had at one time pulled a woman out of a burning building. Neither parent had first hand knowledge of or knew much about this incident. Their otherwise unverified hearsay was admissible under the evidentiary standards applicable to sentencing hearings but the trial judge was not obliged to credit it. The trial court did not err in failing to find this as a mitigating circumstance.

Trueblood next argues the trial court erred in finding as an aggravating circumstance that the murders were cold-blooded and premeditated, contending this finding was unsupported by the record.

Before the death penalty may be imposed, the State must prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances listed in Ind.Code § 35–50–2–9. The trial court found the State had proved the existence of two of the enumerated aggravating factors beyond a reasonable doubt: that the victims of the murder were less than 12 years old, Ind.Code § 35–50–2–9(b)(11) (West Supp.1991),[6] and that Trueblood had been convicted of another murder (that of

Susan), Ind.Code § 35–50–2–9(b)(7).[7] Trueblood does not dispute the proof of these statutory aggravating circumstances. The trial court did not find as an aggravating circumstance that the murders were cold-blooded and premeditated.[8]

The trial court was thus called upon to weigh substantial aggravating circumstances—the commission of a triple murder and the murder of young children—against the modest mitigators described above. The trial judge was warranted in finding that the aggravators outweighed the mitigators and in imposing the death penalty in accordance with Ind.Code § 35–50–2–9.

The judgment of the trial court is affirmed.

DeBRULER, GIVAN and DICKSON, JJ., concur.

KRAHULIK, J., concurs in result.

---

6. This subdivision was enacted in 1987 as subdivision (b)(12) and was moved in 1989 to subdivision (b)(11).

7. Trueblood was sentenced to death for all three of the murders. The aggravator for the death sentence relative to Susan's murder was apparently that Trueblood had committed other murders (those of the children). Ind.Code § 35–50–2–9(b)(8).

8. The court did state at the sentencing hearing that the murders were cold blooded and premeditated in the context of its evaluation of the statutory mitigating circumstances. The evidence supported the trial court's statement. Trueblood told a friend a week before the murders that if he had a gun he would kill Susan, the children, and himself. Record at 1831. Trueblood took a gun from his parents' home and shortly thereafter picked up Susan and the children in his car and shot them each in the head because Susan had left him.