**Joseph L. TRUEBLOOD Petitioner,**

v.

**Rondle ANDERSON, Respondent.**

**No. 3:00 CV 125 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

July 30, 2001.

F. Thomas Schornhorst, Orange Beach, AL, for Petitioner.

Suzannah B. Wilson, Thomas D. Perkins, Michael A. Hurst, Indiana Attorney General, Indianapolis, IN, for Respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, Joseph L. Trueblood, pled guilty to three counts of murder before a judge in Tippecanoe County, Indiana, and was sentenced to death by that judge. The petition was filed by counsel in this Court on August 28, 2000 and oral argument was heard in Lafayette, Indiana on April 5, 2001. At this court's request, the parties filed supplemental briefs concerning two recent opinions of the Seventh Circuit on July 23, 2001. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely

*Trueblood v. State,* 587 N.E.2d 105 (Ind. 1992), *cert. denied,* 506 U.S. 897, 113 S.Ct. 278, 121 L.Ed.2d 205 (1992), and *Trueblood v. State,* 715 N.E.2d 1242 (Ind.1999), *cert. denied.* 531 U.S. 858, 121 S.Ct. 143, 148 L.Ed.2d 94 (2000). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

## I. Factual and Procedural Background

The Indiana Supreme Court described the murders of Susan (Bowsher) Hughes and her children, Ashlyn and William, as follows:

> Trueblood, a former boyfriend of Susan Bowsher, was upset with Susan because she was going to return to her ex-husband. He took a gun from his parents' house. A few days later on August 15, 1988, he picked up Susan and her two children, Ashlyn, age two and a half, and William, age seventeen months. While they were in his automobile Trueblood shot each of them in the head, killing all three. He then drove to his brother's home and borrowed a shovel. He took the victims to a secluded area and buried them in a shallow grave.

*Trueblood v. State,* 587 N.E.2d 105, 107 (Ind.1992). Trueblood was arrested on August 16, 1988 and charged on August 22, 1988 with the murder of Susan, Ashlyn, and Billy. T.R. 1–4.[1] The State of Indiana amended the charge on September 2, 1988, adding three counts seeking the death penalty for each of the murders. T.R. 24–27.

George Wilder, the Public Defender for Tippecanoe County, was appointed as counsel to Trueblood by Judge Kenneth P. Thayer of the Tippecanoe Superior Court, and entered his appearance on August 28, 1988. T.R. 13. On October 6, 1988, while represented by Wilder, Trueblood pled guilty to the murder of Susan. T.R. 55, 680. During that hearing, Trueblood testified that he killed Susan "(b)ecause she'd already shot herself twice, and after she shot herself the second time, she looked at me and I pulled her towards me, she looked at me and tried to tell me to kill her by trying to move her mouth and motioning with her hand." T.R. 695. The prosecutor attempted to inquire into the deaths of the children, but the court sustained an objection by Trueblood's counsel. T.R. 700. The prosecutor then said, "Mr. Trueblood, you understand that simply because you pled guilty to Count III, murder of one Susan Bowsher Hughes has no bearing on the remaining counts? Do you understand that?" *Id.* When Trueblood answered affirmatively, the prosecutor continued with "you are also aware that the state fully intends to proceed with those counts? ... Including the death— the allegation of the death count involving this particular information, do you understand that?" *Id.* Trueblood again responded affirmatively. *Id.* The court accepted the plea, and Mr. Wilder asked the court to waive the thirty-day sentencing requirement and continue sentencing until after the trial of the remaining counts, which motion the court granted. T.R. 702. The prosecutor then recommended that the court advise Trueblood not only of the potential jail terms, as it had done prior to accepting the plea, but also of the potential death penalty. T.R. 703. Wilder objected, stating that "this is a simple count of murder as it stands right now, Your Honor, for the purposes of this count. The only possible penalty he can face as of now would be the thirty to sixty." *Id.* The prosecutor responded, "But my point being what the statute provides is the Court is

---

1. This court will refer to the trial record as T.R. ___, the post-conviction record as P.C.R. ___, Petitioner's Exhibits during the post-conviction hearing as Pet.Ex.___, p. ___, and State Exhibits during the post-conviction hearing as State Ex. ___, p. ___.

obliged to inform the defend—any defendant of the potential penalties and in this case, the way it—even the way it's played out up to this point, that is a potential penalty." *Id.* The court agreed "that is a potential penalty," and Wilder withdrew his objection. *Id.* The court then began, "[s]o I'll so advise the ..." and the prosecutor stepped in, saying "[a]nd Mr. Trueblood, does that have any effect on your plea of guilty here this afternoon, being so advised?" *Id.* Trueblood responded, "[n]o," and the hearing was concluded. *Id.*

Although the trial was initially set in December, 1988, it was continued twice before Judge Thayer transferred the cause to Judge Ronald Melichar in the Tippecanoe Circuit Court on April 28, 1989. T.R. 149. Judge Melichar initially set a trial date of October 31, 1989 upon taking the case. However, on August 22, 1989, George Wilder withdrew his appearance upon his resignation from the position of Tippecanoe County Public Defender. T.R. 152. Judge Melichar then appointed Thomas O'Brien as lead counsel and Michael J. O'Reilly as co-counsel on August 28, 1989. T.R. 156. Those counsel moved for a continuance, and on October 2, 1989, Judge Melichar continued the trial to February 13, 1990. T.R. 166.

On December 6, 1989, Trueblood, by counsel, filed a verified petition to withdraw his plea of guilty to the murder of Susan Bowsher Hughes, arguing that the attorney who had counseled Trueblood to plead guilty was no longer representing him and that it would be a "manifest injustice" under Ind.Code 35-35-1-4(c) "to require [Trueblood's] defense to be presented on a theory that his current attorneys were not involved in formulating." T.R. 263. On December 20, 1989, the court denied that motion, finding that no fair and just reason for withdrawal existed and that Trueblood had failed to proved that withdrawal of the plea was necessary to correct a manifest injustice. T.R. 286. Trueblood then filed a motion demanding sentencing on the count to which he had pled on December 28, 1989, but the court denied that motion at a hearing on January 11, 1990. T.R. 299, 361.

The court summoned a special venire beginning on February 13, 1990 for the purpose of selecting a jury for the trial of Trueblood, and began voir dire on that day. T.R. 405. Voir dire continued on February 14, 15, and 16, and the jury was finally seated and sequestered on February 20, 1990. T.R. 454. On February 21, 1990, the court gave its preliminary instructions, heard the opening statement from the prosecution and the waiver of a statement by the defense, and the first presentation of evidence, including the testimony of William and Christine Hughes, parents of Susan Bowsher Hughes' ex-husband, regarding Susan's activities on the day of the murder. T.R. 455, 722 *et seq.*, 795 *et seq.* Susan and the children had been living with the Hughes for the two weeks prior to the murder in a reconciliation with her ex-husband. T.R. 727.

Trueblood's twin brother William began his testimony on the afternoon of February 21. T.R. 818. William testified that Trueblood arrived at William's apartment on the evening of the murder and told him "he'd just shot Susan and the kids were dead." T.R. 821. William then asked who killed the kids, and Trueblood responded that he had killed the kids. *Id.* Trueblood then asked to borrow a shovel and left to bury the bodies in a woods where the family often hunted. T.R. 829. Trueblood returned that evening and took a shower at William's apartment and talked with William about the murder, explaining that he had killed the children because he was afraid they would tell on him. T.R. 839. William's testimony extended into the following morning, February 22. T.R. 866.

After William's testimony, the court had an extended colloquy with the lawyers regarding the admission of the autopsy photographs. T.R. 988–1029. Trueblood was present throughout the display of the photographs during the evidentiary ruling, but when the pathologist began showing the photographs during his testimony, Trueblood asked to be excused from the courtroom. T.R. 1092. After the presentation of evidence on February 22, 1990, Trueblood met with his attorneys and his mother at the Tippecanoe County Jail and decided to plead guilty to the murders of the two children. T.R. 1139.

Thus, on the morning of February 23, 1990, Trueblood withdrew his pleas of not guilty to the murders of the children and entered pleas of guilty to both counts. T.R. 1116–71. Again, no bargain was made with the prosecution. T.R. 1136–37. Trueblood admitted the bare acts of shooting each child, but his attorneys objected to eliciting any further details of the murders. T.R. 1140, 1142. The court then set the hearing on the penalty phase for March 1, 1990, and asked the probation officer to prepare a pre-sentencing investigation report prior to the hearing. T.R. 1163.

Probation Officer Joe Hooker interviewed Trueblood as a part of the presentence investigation on February 26, 1990, and during that unsworn interview, Trueblood told Hooker that he had not killed the children, but had pled to doing so because he was convinced the jury would sentence him to death. T.R. 651–62. Trueblood's attorneys then filed a petition to withdraw their appearances, a notice of perjured testimony, and a petition to withdraw the pleas of guilty, all based on Trueblood's statement to Hooker. T.R. 640–44.

The court held a hearing on March 2, 1990 on the pending motions and immediately denied the attorneys' motion to withdraw. T.R. 1176. Trueblood then took the stand and repeated under oath his assertion that he had not killed the children, stating that he had so testified during his change of plea hearing because he believed the jury would wrongly convict him and that he would rather trust his fate to the judge's decision. T.R. 1179. After a lengthy cross-examination by the prosecutor, the court addressed Trueblood as follows:

> Mr. Trueblood, when you testified last Friday, I believed you. I believed you were telling me the truth. I don't believe you today. I think you're lying. It's an awful thing to say in open Court, but I think last week you intelligently entered your plea in this case. You knew what you were doing, that your plea was—had a factual basis, and that it was true. I think your testimony today is a counterfeit. Accordingly, I'm gonna deny your request to withdraw your plea of—pleas of guilty, and we'll proceed accordingly.

T.R. 1211. The court then proceeded to hold a penalty phase hearing to determine Trueblood's sentence. T.R. 1212 *et seq.*

The prosecution moved to incorporate the evidence presented at trial and during the hearing on Trueblood's motion to enter a plea of guilty, then rested. T.R. 1213–14. Trueblood's counsel made a brief opening statement, then presented evidence from several witnesses. Correctional Officer Vince Andrews of the Tippecanoe County Sheriff's Department testified that Trueblood had not caused any problems during his incarceration at the Tippecanoe County Jail. T.R. 1227. Correctional Officer John Hahn gave similar testimony, stating that Trueblood had only caused trouble on one or two occasions during his year and a half at the jail. T.R. 1235. Correctional Officer John Robbins testified that he had had only one problem with Trueblood during the seven months

he had been employed at the jail. T.R. 1241.

Trueblood's sister, Elaine Trueblood, testified on direct that Trueblood had always been helpful to her, both financially and emotionally, and had never shown any violent tendencies towards herself or her children. T.R. 1246, 1251. Kelly Simmons, also a sister of Trueblood's, testified that Trueblood was always generous and kind to her children, although on cross-examination she admitted that Trueblood had supplied her with marijuana on occasion. T.R. 1257, 1263. David Trueblood, another of Trueblood's four brothers, testified that Trueblood had occasionally been disciplined by his parents, but that he had been a good child. T.R. 1273. On cross-examination, David testified that he had been sexually abused by his brother Ray as a child and that he had seen Trueblood hit his wife Sherry on one occasion. T.R. 1282, 1286.

Trueblood's mother, Patty Trueblood, testified that Trueblood was good with the grandchildren, that he had given her his entire paycheck after he dropped out of school to help support the family, that he visited her regularly when she was in the hospital, and that he once saved a woman by pulling her from a burning building. T.R. 1288–98. On cross-examination, Patty admitted that Trueblood had smacked his wife Sherry on occasion. T.R. 1300. Trueblood's father, William Joseph Trueblood, testified that he had disciplined his children, including Trueblood, by whipping them with various implements and that he taught all of his sons how to shoot firearms. T.R. 1316–17. On cross-examination, the prosecution delved further into the father's use of corporal punishment against Trueblood and his siblings, including whipping them with belts, and the father's abuse of the mother, sending her to the hospital on one occasion. T.R. 1331, 1333.

Trueblood then presented the testimony of Dr. Diane Follingstad, a clinical psychologist employed at the University of South Carolina. T.R. 1350. She testified that she had reviewed a number of intelligence and other tests taken by Trueblood and had reached various conclusions about Trueblood based on those tests. She opined that under the Megargee classification system, Trueblood would be well adjusted to prison life and would not cause significant problems in the structured prison system. T.R. 1365–66. Brian Foltz, Trueblood's former brother-in-law, and Mike Simmons, another brother-in-law, both testified that Trueblood was kind to their children and not a violent person. T.R. 1437, 1440. Simmons testified on cross that Trueblood had slept at his home the night of the murders and that Trueblood had burned some items in a bonfire in Simmons' yard. T.R. 1446–47. Floyd Farrester, a friend of the Trueblood family, testified that Trueblood was a kind person who only fought to protect himself or his family and that Trueblood had been physically and verbally abused by his father as a child. T.R. 1456, 1458.

Dr. Richard Loughead, a clinical psychologist, testified that he and his partner, Kathryn Black, had first been asked to make an assessment of Trueblood's history to develop a psychological profile of him. T.R. 1471. Loughead and Black conducted approximately 60 hours of interviews with Trueblood and his family and formulated a diagnosis of mixed personality disorder with borderline and antisocial traits. T.R. 1473. Loughead's report was admitted into evidence as Defendant's Exhibit D, and it details an extremely violent home life for Trueblood, his siblings and mother. T.R. 1479, p. 3. Neither Trueblood nor any of his siblings completed high school, in part due to the family culture. *Id.*, p. 6. Trueblood had been married to Sherrie Trueblood for over ten years at the time of

the murder, and during their marriage he had slapped her during various arguments. *Id.* at p. 9. Trueblood had not lived with Sherrie during the last six years of their marriage, but had maintained a friendship with her and socialized with her and her boyfriend. *Id.* at p. 10. Loughead agreed on cross-examination with the opinion of forensic psychiatrist Larry Davis that Trueblood was legally sane and competent at the time of the murders. T.R. 1537.

In rebuttal, the prosecution recalled Trueblood's parents to the stand, where both testified that a gun had been taken from their lockbox sometime shortly before the murder. T.R. 1562, 1580. The prosecution then called Detective James Withers of the Lafayette Police Department. T.R. 1587. Withers was present when Trueblood was arrested and advised him of his Miranda rights and later persuaded Trueblood to take the police to where the victims were buried. T.R. 1591, 1603. Withers then drove Trueblood to the West Point area in southwestern Tippecanoe County, but Trueblood failed to take Withers to the burial place; in fact, Trueblood directed Withers past the actual burial place on at least two occasions. T.R. 1611. Withers was present when the bodies were later uncovered after being discovered by a local resident and identified photos from the burial site. T.R. 1620. Detective Jerry Jarrard of the Lafayette Police Department testified that he participated in the arrest of Trueblood and in the impounding of Trueblood's car. T.R. 1676–80. Jarrard observed the car to be covered with bloodstains and he found bullets in the car. T.R. 1680–84.

Sherrie Trueblood, Trueblood's wife, testified that Trueblood regularly abused her during the time they lived together. T.R. 1748. Sherry O'Connor, a friend of Susan Bowsher Hughes, testified that she had seen Susan bruised on various occasions which Susan said were caused by Trueblood and that she had also seen injuries on Ashleyn which she believed were caused by Trueblood. T.R. 1848–49. Sandra Marshall, the girlfriend of Susan's brother, testified that she had helped move Susan out of the trailer she shared with Trueblood approximately two weeks before her murder, and that she heard Trueblood say to Susan "you better think about what I said" while they were moving her out. T.R. 1886. Finally the state called Robert Hughes, Susan's ex-husband, who testified that Susan had told him she was leaving Trueblood because he beat her and her children. T.R. 1894.

On April 12, 1989, the court held a sentencing hearing and allowed the attorneys to deliver final arguments to the court. T.R.1947. Trueblood's attorneys primarily argued that Trueblood was violent towards his wife and towards the victim because he had been abused as a child. T.R.1956. Additionally, they argued that Trueblood had not planned the murder and that he would adapt well to prison life. T.R.1958, 1960. The court found that Trueblood had committed murder and found that the state had proven two aggravating circumstances beyond a reasonable doubt; specifically that Trueblood had killed two victims who were under twelve years of age. T.R. 1972. Additionally the court reviewed the mitigating circumstances suggested by the defense and found that none of them outweighed the aggravating circumstances proven by the state. T.R.1972–73. Thus, the court sentenced Trueblood to be executed. T.R.1973. It also appointed his trial counsel to continue to represent him on direct appeal to the Indiana Supreme Court. *Id.*

On February 28, 1992, the Indiana Supreme Court affirmed the trial court's judgment and sentence of Trueblood in an opinion written by Chief Justice Shepard. *Trueblood v. State,* 587 N.E.2d 105 (Ind.

1992). Trueblood first argued to the court that the trial court erred in refusing to allow him to withdraw his guilty pleas after he asserted his innocence. 587 N.E.2d at 107. Under Indiana law, "a judge may not accept a plea of guilty when the defendant both pleads guilty and maintains his innocence at the same time." *Id.* citing *Ross v. State,* 456 N.E.2d 420, 423 (Ind.1983). In *Patton v. State,* 517 N.E.2d 374 (Ind.1987), the Indiana Supreme Court applied the *Ross* rule to a protestation of innocence after a guilty plea was accepted in a capital case and reversed a murder conviction and death sentence where the defendant maintained his innocence at the sentencing hearing after acknowledging the facts alleged in the probable cause affidavit at his change of plea hearing. *Id.* at 107–08. In Trueblood's case, the court found that Trueblood had acknowledged specific facts regarding the murders and that evidence had been received in the trial before Trueblood pled which supported the guilty plea. *Id.* at 109. Thus, the court held that the trial court had not abused its discretion in denying Trueblood's motions to withdraw his guilty pleas. *Id.* at 110.

Trueblood then challenged his sentence, arguing that the court had failed to consider some of his mitigating circumstances and that it had found an aggravating circumstance unsupported by the evidence. *Id.* The Indiana Supreme Court held that the trial court had considered all mitigating evidence presented by Trueblood and gave it appropriate weight. *Id.* at 111. Additionally, it found that the trial court had not found as an aggravating circumstance that the murders were cold-blooded and premeditated. *Id.* The court held that the trial court had appropriately weighed the aggravating and mitigating circumstances and thus affirmed the conviction and sentence. *Id.*

On October 26, 1992, Jeffrey Evans and Janet Dowling of the State Public Defend-ers Office entered their appearances on behalf of Trueblood and filed their Notice of Intent to File Petition for Post–Conviction Relief. P.C.R. 56, 59. Attorneys Kathleen Littell and Douglas Essex of the State Public Defenders Office then substituted their appearances for those of Evans and Dowling on January 15, 1993. P.C.R. 65. After several extensions had been granted to Trueblood's counsel, the Indiana Supreme Court entered an order on March 9, 1994 requiring that the petition be filed within sixty days or an execution date would be set. P.C.R. 113. Thus, on May 9, 1994, Trueblood, by counsel, filed his petition for post-conviction relief in the Tippecanoe Circuit Court before Judge Melichar. P.C.R. 115. In his petition, Trueblood argued that his guilty pleas were not knowing, intelligent or voluntary, that the factual bases for his pleas were violative of the Constitution, that his guilty plea, sentence of death and direct appeal were unreliable, arbitrary and capricious due to trial court error, that he received ineffective assistance of counsel both at trial and on direct appeal, that his sentence was disproportionate and that he was deprived of due process. P.C.R. 117–19. On May 18, 1994, Trueblood moved for a change of venue from the judge, which the court granted on May 31, 1994. P.C.R. 145, 152. Judge Thomas Milligan of the Montgomery Circuit Court was appointed as Special Judge on June 20, 1994. P.C.R. 164. Christopher Hitz–Bradley entered his appearance on behalf of Trueblood on August 3, 1994. P.C.R. 167.

On November 17, 1995, the state filed a motion for summary judgment on some of the claims in the petition, asserting that Trueblood could not show any facts to support his claims that his plea was not knowing and voluntary, that the factual bases for his guilty plea did not comport with the requirements of the law, and that his sentence was inappropriate.

P.C.R. 286. Trueblood filed his own motion for summary judgment on November 17, 1995, asserting that his plea of guilty to the murder of Susan Bowsher Hughes was not knowingly or voluntarily made, that improper aggravating factors were considered by the court in determining his sentence, and that he was improperly sentenced to death for the murder of Susan Bowsher Hughes. P.C.R. 490. On June 13, 1996, the court issued an order denying Trueblood's motion for summary judgment and granting the state's motion for summary judgment in part. P.C.R. 2030. The court found that Trueblood was specifically advised that the pleas of guilty would be considered aggravating circumstances, and that his belief that his willingness to plead guilty would be considered mitigating did not render his plea involuntary when it was not used as mitigation. P.C.R.2032–33. The court found that there was no evidence to suggest that Trueblood was not competent to enter a plea. P.C.R.2034. Trueblood's argument of prejudice arising from his sentencing by Judge Melichar on the plea of guilty made before Judge Thayer was unavailing, as was his claim that he could not receive a fair trial in Tippecanoe County. P.C.R.2035–36.

The court granted the state's motion for summary judgment on Trueblood's claim that the factual bases for his plea did not comport with the Constitution on the basis that the Indiana Supreme Court had denied that claim and thus it was res judicata. P.C.R.2037. The court found that the assertions of trial court error alleged by Trueblood in paragraph three all went to the reliability of the guilty plea, and thus the court granted the state's motion for summary judgment on that claim. P.C.R. 2041. The court found that paragraphs six, seven, eight, nine, ten, and twelve of the petition were also either res judicata or otherwise waived and granted summary judgment on those claims as well. P.C.R.

2047. Thus, the only claims remaining for consideration were claims IV, V, and XI of the Amended Petition. *Id.* Those paragraphs asserted claims of ineffective assistance of appellate counsel, ineffective assistance of trial counsel, and a claim that the conviction and sentence were unreliable and violative of Trueblood's due process rights because all of the trial evidence was destroyed prior to the post-conviction proceedings. P.C.R. 1294, 1297, 1319.

The court then held a hearing on the remaining counts of the petition on June 25 and 26, 1996 and July 16, 17, and 26, 1996. P.C.R. 2679. Trueblood first offered the testimony of Jill Miller, a forensic social worker, who testified about the social history she had prepared on Trueblood. P.C.R. 2712. In her testimony and her report, Miller detailed Trueblood's abusive childhood, poor educational history, and poor relationship testimony. She ended her assessment of Trueblood with the following:

> Joe has made a good adjustment to incarceration, both in the jail and the prison. He does well in structure, here there are clear rules, stability and predictability. He follows the rules, makes constructive use of time, and gets along with staff and other inmates. His problems in relationships have generally been in relationships with women, primarily Sherry and Susan. Joe and Susan appeared to have been drawn to one another by their common experience. It appears that both were damaged by early life and family experiences, and established a strong bond with each other. Both were moody and volatile, and capable of impulsive and destructive behavior. In this case, the results were extraordinarily tragic.

Pet. Ex. 28, p. 74.

Trueblood then presented testimony from Pamela Porter, a mental health ther-

apist specializing in post-traumatic stress disorder, who opined that Trueblood suffered from post-traumatic stress disorder caused by his abusive childhood, and further stated that the disorder would have interfered with his decision to think clearly with respect to his decision to plead guilty. P.C.R. 2931, 2963. Dr. Raymond Horn, a clinical neuropsychologist, testified that he had performed a neuropsychological battery of tests on Trueblood in 1989 while Trueblood was in jail awaiting trial. P.C.R. 2994. Horn was not called to testify at trial, but testified at post-conviction that he would have testified had he been asked, and his testimony would have been that Trueblood was basically of average general intellectual ability, but that he was deficient in some more complex intellectual skills. P.C.R. 2996–97. Dr. Michael Gelbort, a clinical psychologist, testified that he had tested Trueblood after his conviction and determined that Trueblood was impaired in his ability to process information. P.C.R. 3043, 3079. Gelbort added that the impairment would have hindered his ability to assist his counsel during trial. P.C.R. 3087. Petitioner offered affidavits from a number of individuals, including his siblings, his ex-wife, neighbors and others, most of which addressed Trueblood's family history and suggested that Trueblood's trial counsel did not adequately investigate the family prior to trial. Pet. Ex. 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, and 41.

Trueblood offered the testimony of his trial counsel by evidentiary deposition. P.C.R. 3279. Michael O'Reilly testified that he had joined the case in September 1989 after being asked to assist by Tom O'Brien, the public defender. Pet. Ex. 44, p. 4. O'Reilly had never participated in a capital case prior to Trueblood. Pet. Ex. 44, p. 9. Thomas O'Brien was participating in another capital case at the same time as Trueblood's case and had attended two seminars on defending capital crimes, but had not previously defended a capital case.

Pet. Ex. 45, p. 5, 28. George Wilder, Trueblood's original attorney, testified by affidavit that he had encouraged Trueblood to plead guilty to the murder of Susan Bowsher to demonstrate his cooperativeness. Pet. Ex. 31, p. 2. In a separate affidavit presented by the state, Wilder stated that he had participated in the defense of other death penalty cases prior to Trueblood and had attended the death penalty defense seminars sponsored by the Indiana Public Defender Council. State Ex. QQ, p. 3.

After the five days of hearing, the court took the case under advisement and asked the parties to file proposed findings of fact within a week of the final day of hearing. P.C.R. 3813. On August 12, 1996, the court entered judgment denying the remaining paragraphs of the petition. P.C.R. 2427. The court considered the claims of ineffective assistance of counsel under the precedent of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It specifically found that Trueblood had been fully advised prior to making a tactical decision to plead guilty to Count III. P.C.R. 2456. It similarly found that Trueblood had been fully advised prior to his decision to plead guilty to Counts I and II. P.C.R. 2457. The court did not find any of the actions of counsel to constitute deficient performance, either in the trial or the appellate phase. P.C.R. 2470. Additionally, to the extent that any of the actions might be construed as deficient, the court found that none of them were prejudicial to defendant. *Id.* Thus, the court denied the petition and affirmed Trueblood's conviction and sentence. *Id.*

Trueblood appealed the denial of his post-conviction petition to the Indiana Supreme Court. On September 9, 1999, the Indiana Supreme Court affirmed the trial court's denial of his petition in a unani-

mous opinion written by Justice Boehm. *Trueblood v. State*, 715 N.E.2d 1242 (Ind. 1999). The court first considered Trueblood's claim of ineffective assistance of counsel in his guilty pleas and sentencing. 715 N.E.2d at 1248. The court found that "Wilder's advice to cooperate and plead guilty [to Count III] was a reasonable judgment under the circumstances." *Id.* at 1250. Similarly, the court found the post-conviction court's finding that Trueblood had pled guilty to counts I and II in an "effort to appear cooperative and compliant and remorseful and attempting to avoid the imposition of the death penalty" was fully supported by the record. *Id.* at 1251.

Trueblood asserted that his trial counsel were ineffective for failing to investigate and present more mitigating evidence, specifically in the area of neurocognitive defects. *Id.* The Supreme Court held that the selection of witnesses by counsel was a strategic decision which was not constitutionally deficient. *Id.* at 1253. Similarly, the failure of trial counsel to present evidence that Trueblood had post-traumatic stress disorder was not deficient because none of the many mental health experts who examined Trueblood prior to trial informed counsel that he suffered from that disorder. *Id.* The court did not fault the trial counsel for not seeking a change of judge after he attempted to withdraw his guilty pleas to Counts I and II and the trial court asserted on the record that Trueblood was "lying," stating that there was no evidence a change of judge would have been granted, and in any event, trial counsel believed Judge Melichar was their "best opportunity." *Id.* at 1254. The court found that trial counsel's alleged failure to adequately prepare the mitigation witnesses did not rise to the level of deficient performance, as further testimony by those witnesses was unlikely to have affected the sentence. *Id.* Finally, the court found that Trueblood's counsel were not

deficient in failing to object to hearsay regarding Trueblood's prior domestic abuse of Susan Bowsher Hughes. *Id.* at 1255.

On his claim of ineffective assistance of appellate counsel, Trueblood asserted four errors:

(1) failure to "compile and file an adequate record" of the proceedings; (2) failure to challenge the "gruesome" slides of the children that were presented at trial; (3) failure to challenge the State's use of hearsay testimony in rebuttal; and (4) issues relating to sentencing including (a) the trial court's failure to consider mitigating evidence; (b) the absence of an aggravating circumstance to support the death sentence for Susan's murder; © failure to challenge adequately the trial court's reliance on non-statutory aggravating circumstances; and (d) the proportionality and appropriateness of his sentence.

*Id.* The court found the first error waived for failure to develop it in the brief. *Id.* at 1256. The court held that the issue of the slides could not have been raised on direct appeal because it went to the voluntariness of his plea, which could not be challenged on direct appeal under state law. *Id.* Trueblood's claim of appellate counsel error for failing to challenge use of hearsay evidence was unavailing, as Trueblood failed to develop the argument beyond his claim of trial counsel error on the same issue. *Id.*

On the sentencing issues, the court first found that Trueblood's claim of ineffective assistance of appellate counsel for failing to adequately present mitigating evidence was dealt with in the ineffective assistance of trial counsel section. *Id.* The court found that appellate counsel's failure to argue that Trueblood's guilty plea was a mitigating factor was not ineffective because it would have been inconsistent to

argue that the guilty plea was a mitigator and simultaneously argue that the trial court erred in refusing to vacate the plea. *Id.* at 1257. The court found that appellate counsel's failure to raise the issue that the trial court did not specify a statutory aggravating factor for Susan's murder was not an error because had the error been raised, the Supreme Court would have remanded the case on direct appeal to rectify the omission and facts existed in the record to support the aggravator that Trueblood had committed other murders. *Id.* at 1257–58. Appellate counsel's failure to anticipate the *Bivins* decision, limiting aggravating circumstances to those listed in the death penalty statute was not ineffective assistance, nor was it ineffective for appellate counsel to fail to raise the court's inclusion of non-statutory aggravators in its listing of mitigating evidence. *Id.* Finally, the court held that Trueblood's appellate counsel was not ineffective for failing to make a disproportionality argument against his death sentence, as such a claim was unlikely to succeed and he had other more legitimate claims. *Id.* at 1259.

Trueblood next challenged various rulings of the postconviction court. *Id.* at 1260. The court found that the postconviction court had appropriately granted summary judgment on certain claims and had appropriately dismissed certain other claims. *Id.* at 1261. The court also found that the evidentiary rulings of the postconviction court were appropriate. *Id.* at 1262. Specifically, the court found that the postconviction court properly excluded evidence of a family friend regarding sexual abuse in Trueblood's childhood home and properly excluded an affidavit concerning the existence of semen in Susan's vagina during her autopsy. *Id.* at 1261–62.

Finally, Trueblood argued that the postconviction court should have vacated his guilty pleas as involuntary. *Id.* at 1262. Trueblood argued that his " 'mental health deficits' impacted his judgment and decision-making abilities to such an extent as to 'profoundly undermine' his ability to enter into a constitutionally adequate guilty plea." *Id.* at 1263. The postconviction court found that "there is nothing about any of the finding of any of the mental health experts which either alone or in combination with other factors would render the Petitioner incompetent to enter a plea or which would render any of his pleas unknowing, involuntary, or unintelligent." *Id.* at 1264. The Supreme Court affirmed that decision, holding that because "Trueblood has not convinced this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the postconviction court, we affirm the postconviction court's conclusion that the guilty pleas were voluntary and intelligent." *Id.* at 1265. Thus, the court affirmed the denial of postconviction relief.

Trueblood filed his notice of intent to file a petition for writ of habeas corpus with this court on February 28, 2000, and filed his petition on August 28, 2000. The petition asserts seven grounds for relief: that his plea of guilty to count III (the murder of Susan Bowsher Hughes) was unknowing, uninformed, and involuntary; that he received ineffective assistance of counsel on his plea of guilty to count III; that he received ineffective assistance of counsel on the entry and attempted withdrawal of his pleas of guilty to counts I and II; that he was denied due process by the judge's weighing of invalid aggravating circumstances; that he was denied due process by the judge's failure to consider several mitigating circumstances; that he received ineffective assistance of counsel at sentencing; and that he received ineffective assistance of counsel on direct appeal. The state responded to the petition on January 23, 2001, and petitioner filed his traverse on March 23, 2001. This court heard oral

argument on April 5, 2001, and will now rule on all claims.

## II. Standard of Review

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential standard for evaluating state court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Supreme Court handed down an opinion further explaining the application of the AEDPA on April 18, 2000, in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams* specifically addresses the application of the "contrary to, or involved an unreasonable application

of, clearly established law" language from the AEDPA in the *Strickland* context. 120 S.Ct. at 1499. In a divided opinion, Justice O'Connor delivered the opinion of the court regarding the appropriate interpretation of that clause. *Id.* at 1516. Specifically, the court held that "contrary to" and "involved an unreasonable application of" clauses of the statute have independent meaning. *Id.* at 1519. The court defined "contrary to" as an instance where the state court "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20. The court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Concluding the section of her opinion defining the statute, Justice O'Connor stated as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case.

*Id.* at 1523.

It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke,* 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.,* citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However,

the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

### III. Invalid Guilty Plea on Count III

■ Trueblood's first claim is that his plea of guilty to the murder of Susan Bowsher Hughes was not knowing or voluntary. Specifically, Trueblood argues that he was not made sufficiently aware that (1) he was pleading guilty to a predicate offense for which the death penalty would be sought in a separate sentencing hearing; (2) that by pleading guilty to the charge of murdering Susan Bowsher Hughes he was admitting to an aggravating circumstance that would support the imposition of the death penalty for each of the separately charged murders of the two children; (3) that his plea of guilty would relieve the State of the burden of proving beyond a reasonable doubt the existence of the aggravating circumstance of having committed another murder as required by IND. CODE 35–50–2–9(a), and (4) that he would be waiving his right to an advisory verdict by a jury in any death penalty proceedings with respect to the murder of Susan Bowsher Hughes. In support of this argument, Trueblood asserts the following facts. On the day after he was appointed, Public Defender George Wilder met with the prosecutor and the judge in chambers, without Trueblood present. Pet.Ex. 5. Wilder announced to the judge at that time, "I'm in a position right now where I believe that my client should plead guilty as charged." Pet. Ex. 5, p. 4–5. Wilder then told the judge he planned to "loosen [Trueblood] up" by taking him to the burial site and showing him videos of the exhumation of the bodies. *Id.* Wilder's explanation of this strategy during post-conviction proceedings was that he wanted to show Trueblood's remorse, cooperative conduct and credibility. P.C.R. 3575–82.

Trueblood entered his plea of guilty to Count III on October 6, 1988. T.R. 681–704. During the colloquy between the court and Trueblood, the court only listed the potential term of years and fines as potential penalties, not the death penalty, and the court did not read the count of the information seeking the death penalty on count III. T.R. 684–86. After the court had accepted Trueblood's plea and his counsel had waived sentencing within thirty days, the prosecutor raised with the court the possibility that Trueblood would receive the death penalty. T.R. 702. Although Wilder objected, stating that the only potential penalty on Count III was thirty to sixty years, the court agreed that death was a potential penalty and started to advise Trueblood of that. T.R. 703. The prosecutor then jumped in and asked Trueblood if that affected his plea, to which Trueblood responded 'no,' and the hearing ended. T.R. 703–04.

The Indiana Supreme Court considered this claim in its opinion affirming the trial court's denial of post-conviction relief. 715 N.E.2d at 1263. The court found that Trueblood had "stated he was not suffering from any mental or emotional disability and that his pleas were free and voluntary." *Id.* The court further held that Trueblood had been examined by Dr. Davis prior to the first guilty plea and, quoting the postconviction court's opinion, stated as follows:

There is nothing about any of the finding of any of the mental health experts which either alone or in combination with other factors would render the Petitioner incompetent to enter a plea or

which would render any of his pleas unknowing, involuntary or unintelligent. *Id.* at 1264. The court also considered Trueblood's claim that Wilder had coerced Trueblood into pleading guilty on Count III, but found that Wilder had conducted a significant investigation prior to the first plea and had taken Trueblood to the burial site at Trueblood's request. *Id.* Finally, the court found that Trueblood had been fully advised of all of the potential consequences, including death, of his plea on Count III. *Id.* at 1264–65. Thus, the Indiana Supreme Court found the plea to be voluntary and intelligent. *Id.* at 1265.

In his brief to the Indiana Supreme Court, Trueblood cited *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) and *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), for the proposition that a guilty plea must be knowing and voluntary. Return to Show Cause, Ex. E, p. 109. The Indiana Supreme Court, however, did not cite either of these opinions in affirming the trial court. *Boykin* held that a court must make sure the accused "has a full understanding of what the plea connotes and of its consequences." 395 U.S. at 244, 89 S.Ct. 1709. Under *Brady v. United States*, a plea is voluntary only if entered "by one fully aware of the direct consequences." 397 U.S. at 755, 90 S.Ct. 1463. Although the Indiana Supreme Court found that Trueblood had been advised of the potential of a death sentence, it did not discuss the lack of evidence that Trueblood was advised that his plea of guilty to Count III would constitute an aggravating circumstance for Counts I and II. Under 28 U.S.C. § 2254(d), a court can only grant a writ of habeas corpus where the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Indiana Supreme Court's decision cannot be considered a reasonable determination of the facts in light of the evidence, where the evidence was clear that Trueblood was not fully advised of the consequences of his plea. This court cannot find it reasonable to consider a plea knowing and voluntary where the defendant was not advised that his plea of guilty was also an admission of an aggravating circumstance in two other capital murder charges and that he was waiving his right to an advisory jury verdict on his sentence. Although *Boykin* specifically addresses the waiver of the privilege against self-incrimination, the right to trial by jury, and the right to confront one's accusers, its primary requirement is that the defendant have a "full understanding of what the plea connotes and of its consequences." 395 U.S. at 244, 89 S.Ct. 1709. This court cannot imagine a greater consequence than the admission of guilt to one count of capital murder, which would also constitute an aggravating circumstance in two other counts of capital murder, and it is undeniable that Trueblood was not advised of the use of his plea as an aggravating circumstance in the other two murders. Thus, this court must grant the petition on this count and find the plea of guilty to Count III unknowing and unvoluntary.

## IV. Ineffective Assistance of Trial Counsel

Trueblood next asserts that he received ineffective assistance of counsel in his plea of guilty to Count III, his pleas of guilty, and attempt to withdraw those pleas. to Counts I and II, and in sentencing. Those claims are considered under the standards of *Strickland v. Washington*, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on these claims, Trueblood must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

There is no question after *Williams v. Taylor* that *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) "qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams,* 120 S.Ct. at 1512. In *Williams,* the Supreme Court applied the *Strickland* test and determined that the Virginia Supreme Court had rejected a claim of ineffective assistance of counsel in a decision that was both "contrary to" and "involved an unreasonable application of" *Strickland.* 120 S.Ct. at 1512. Williams' attorneys failed to begin their investigation of his background for mitigation purposes until a week before sentencing. *Id.* at 1514. They failed to discover evidence of "Williams' nightmarish childhood" because they incorrectly believed they were barred access to the records under state law. *Id.* They failed to introduce evidence of Williams' poor educational record and low mental ability, nor did they obtain his prison records, which showed him to be a model prisoner. *Id.* Thus, the court found

that Williams' attorneys' performance was deficient in the sentencing phase. *Id.* at 1515. Additionally, the court found that the deficient performance prejudiced Williams within the meaning of *Strickland. Id.* The Virginia Supreme Court had applied the *Strickland* standard as it believed it was modified by *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), and had held that even though there was a reasonable probability that the outcome would have been different had the jurors heard the mitigation evidence not presented, the Supreme Court's admonition in *Lockhart* that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective" required the denial of any postconviction relief. *Id.* at 1513. The Supreme Court held that *Lockhart* did not "justify a departure from a straight-forward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him." *Id.* Thus, it reversed the Virginia Supreme Court for failing to evaluate "the totality of the available mitigating evidence ... in reweighing it against the evidence in aggravation." *Id.* at 1515.

The Seventh Circuit has addressed the question of ineffective assistance of counsel in two recent opinions, *Matheney v. Anderson,* 253 F.3d 1025 (7th Cir.2001), and *Miller v. Anderson,* 255 F.3d 455 (7th Cir.2001). In *Matheney,* the court held that the district court would need to hold an evidentiary hearing on the issue of ineffective assistance of counsel in failing to pursue a competency hearing because the court was unable to determine from the record why defense counsel failed to pursue the hearing, thus making it unable to determine whether counsel's performance had been deficient, and because the court

found that a question existed as to the likeliness that Matheney would have been found incompetent, raising the potential of prejudice caused by the possible deficient performance. *Matheney*, at 1039. However, the *Matheney* court affirmed the decision of the district court finding no ineffective assistance of counsel during the sentencing phase. *Id.* at 1046. The Seventh Circuit reviewed the facts and determined that Matheney could not show that his counsel's failure to call his mental health expert during the sentencing phase caused any prejudice to Matheney, as the sentencing judge rejected the mental health expert's opinion during the guilt phase, and thus was unlikely to have then accepted it in the penalty phase. *Id.* at 1045.

In *Miller*, the Seventh Circuit reversed the district court's decision finding no ineffective assistance of counsel. *Miller*, at 460. The court gave a detailed review of Miller's trial counsel's performance and found numerous examples of deficient performance, including trial counsel's failure to obtain expert testimony on questions of hair, DNA, trademark and footprint evidence, trial counsel's failure to obtain bank records concerning a critical check, and use of a psychologist's testimony, which brought Miller's criminal history into the record. *Id.* at 457–459. The court then determined that Miller would have had a more than negligible chance for acquittal but for the errors of his attorney, and thus he had been prejudiced by those errors. *Id.* at 459.

Given these recent statements from the Supreme Court and Seventh Circuit, this court will now give critical attention to the specific factual allegations of ineffective assistance of counsel to determine whether deficient performance and prejudice stemming therefrom exist in this record.

## A. Guilty Plea to Count III

█ On the claim alleging ineffective assistance of counsel with respect to Trueblood's plea of guilty to Count III, the Indiana Supreme Court affirmed the decision of the postconviction court that "the decision to plead guilty to Count III was a matter of strategy and an informed tactical decision made by Trueblood and his counsel. We agree that Wilder's advice to cooperate and plead guilty was a reasonable judgment under the circumstances." 715 N.E.2d at 1250. The court considered Trueblood's claim that he had potential defenses to Count III, "specifically that (1) he fired a mercy shot at Susan only after she attempted to kill herself and (2) that he was upset from a lover's split and was acting under sudden heat when he killed her." *Id.* at 1249. The court found that the risk of "a devastating cross-examination was obvious" and thus "the judgment not to expose Trueblood to this cannot be the basis of ineffective assistance of counsel." *Id.* at 1250.

Petitioner argues that the Indiana Supreme Court did not consider facts which showed that Wilder, Trueblood's counsel at the time, failed to correctly advise him prior to the plea. Specifically, petitioner points to a finding by the PCR court that Trueblood made statements to Dr. Black within two months of the guilty plea which showed a lack of awareness of the consequences of the plea in terms of the death penalty. P.C.R. 2434. Additionally, during the hearing to withdraw his pleas of guilty to Counts I and II, Trueblood made reference to "the Alfred Mirandum or something like that" and stated that Wilder had told him he could plead guilty while still asserting his innocence. T.R. 1190–91. Under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), the Supreme Court held that an admission of guilt is not a constitutional

requirement for the imposition of a criminal penalty. However, Indiana does not recognize such *"Alford"* pleas; in *Ross v. State,* the Indiana Supreme Court held that "a judge may not accept a plea of guilty when the defendant both pleads guilty and maintains his innocence at the same time." *Ross v. State,* 456 N.E.2d 420, 423 (Ind.1983). Given Trueblood's educational history and mental ability, it seems unlikely that he would have known the word "Alford" in this context had he not been advised by Wilder. However, Wilder's advice was erroneous under Indiana law. Finally, Wilder's statements on the record during the plea colloquy regarding Trueblood's potential penalty suggest that he did not understand what penalty was possible, and thus could not have properly advised Trueblood prior to making the plea. Wilder first objected to any discussion of the potential for the death penalty, arguing that the count standing alone only raised a possibility of a term of years, and then, when the prosecutor pressed the potential death penalty, Wilder merely withdrew his objection, and failed to ensure that the judge fully explained the potential of a death penalty on Count III and as a aggravating factor for the death penalty on Counts I and II. T.R. 703.

This court finds the conclusion of the Indiana Supreme Court that Wilder did not render a deficient performance in counseling Trueblood to plead guilty to Count III to be an unreasonable application of *Strickland v. Washington.* Wilder's failure to understand the full consequences of the plea and failure to explain those consequences to Trueblood cannot be considered adequate representation. The decision to plead guilty and to waive one's rights to trial by jury and confrontation and one's privilege against self-incrimination is a major decision, and even more so in a capital case, and it "demands the utmost solicitude of which the courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin,* 395 US. at 243–44, 89 S.Ct. 1709. Where an attorney has recommended a straight plea of guilty without fully understanding, much less explaining to the petitioner, the potential capital consequences thereof, as is the case here, there can be no question that the performance was deficient.

As explained in *Miller,* "[t]actics are the essence of the conduct of litigation; much scope must be allowed to counsel, but if no reason is or can be given for a tactic, the label 'tactic' will not prevent it from being used as evidence of ineffective assistance of counsel." 255 F.3d at 458. While the Indiana Supreme Court found that the decision to plead Trueblood guilty to Count III was an appropriate tactical decision, there can be no tactical explanation for the failure to explain to Trueblood the full implications of that decision. The prejudice arising from the deficient performance is clear, as the plea of guilty was also an admission to an aggravating factor for each of the other murders. Thus, this court finds it must grant relief on this claim as well. This decision is supported by, but not dependent on, the decision of the Seventh Circuit in *Miller.*

**B. Guilty Pleas to Counts I and II**

█ Trueblood also argues that he was given ineffective assistance of counsel with respect to the entry and attempted withdrawal of pleas of guilty to Count I and II of the information. At the end of the second day of trial, Trueblood met with his attorneys and his mother and decided to enter pleas of guilty to Counts I and II. Trueblood apparently believed that if he pled guilty, he would not receive the death penalty. P.C.R. 3146–47. During the change of plea hearing the next day, Trueblood admitted to the underlying factual

basis for the plea, although not in any great detail. T.R. 1139–43. The court did read the entire death penalty statute, including the list of aggravating circumstances, during the colloquy, although it did not explain the statute in any great detail. T.R. 1128–33. Trueblood then met with the probation to prepare the presentence report and denied that he had, in fact, killed the children, despite his testimony otherwise during the change of plea hearing. P.C.R. Ex. 45, p. 12. Trueblood's counsel, upon hearing that he had recanted his statement from the change of plea hearing, spoke with an ethics professor at Indiana University and with the State Public Defender's Council, and determined that the appropriate course for them to take was to file a Notice of Perjury and a Motion to Withdraw Appearance, as well as a Motion to Withdraw the Guilty Plea. P.C.R. Ex. 45, p. 83. The court held a hearing on the motions and promptly denied the motion to withdraw as counsel. T.R. 1176. Trueblood was brought to the stand, where he explained to the court that he believed the evidence presented, although it didn't prove his guilt, would make the jury angry enough to convict him, and thus "I thought the best thing I could do was to put it in your hands and let you decide." T.R. 1179. Defense counsel did not present any evidence to show that Trueblood had told the same story to the public defender's investigator the week of the crime or that he had maintained the same version of events until the entry of his guilty plea. Thus, the court concluded that Trueblood had lied, not during the entry of the guilty plea, but during his later testimony at the hearing on the motion to withdraw the guilty plea, and the court further stated it believed Trueblood's testimony in the later hearing "is a counterfeit." T.R. 1211.

Petitioner now argues that he received ineffective assistance of counsel at this phase because he did not want to withdraw the guilty pleas, but rather wanted them considered as mitigation in determining his sentence. He argues that his counsel abandoned him at a critical juncture and allowed the prosecution to cast him as manipulating the system, when in fact he only wanted the judge to consider his cooperation as mitigating evidence for his sentence.

The Indiana Supreme Court, in addressing Trueblood's claim of ineffective assistance of counsel in the guilty pleas on Counts I and II, only discussed Trueblood's claim that counsel had pressured him into making the plea and should have had him reexamined by a mental health expert regarding the voluntariness of the plea. 715 N.E.2d at 1251. The postconviction court had found that Trueblood had

> decided to try to cut his losses, short circuit the influence of the evidence on the jury and through the jury to the Judge, and enter a plea of guilty continuing the effort to appear cooperative and compliant and remorseful and attempting to avoid the imposition of the death penalty.

and the Indiana Supreme Court held that finding to be "fully supported by the record." *Id.* This court concurs with that decision and finds no deficient performance on this portion of the issue.

■ The Indiana Supreme Court did not address the assertion that Trueblood's counsels' efforts to help him withdraw the pleas of guilty were ineffective assistance of counsel because Trueblood did not argue such in his appeal of the denial of postconviction relief. Under *Duncan v. Henry,* 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995), this portion of the claim must be barred because the state court was not fairly alerted to the factual basis of the constitutional claim asserted here. Even had the claim been presented to the state court, this court cannot say

that counsel's performance was deficient on this count. The trial court was free to accept Trueblood's in-court sworn statement during his plea of guilty, coupled with the facts presented during the trial, over Trueblood's statements to the defense investigator and the probation officer, and it is unlikely that an explanation of Trueblood's mitigatory intent by counsel would have made any difference in the court's decision. Thus, this court finds no deficient performance here. The Indiana Supreme Court reasonably applied the test of *Strickland,* and therefore Trueblood's claim of ineffective assistance of counsel with respect to the guilty pleas on Counts I and II must be denied.

### C. Sentencing

■ Trueblood finally argues that his trial counsel gave him ineffective assistance during the sentencing hearing. Specifically, Trueblood argues that his attorneys failed to present the testimony of Dr. Horn, who had concluded that Trueblood suffered from brain damage, because they thought Dr. Horn's testimony would conflict with that of another expert, Dr. Follingstad. The postconviction court made the following findings based on the testimony of Dr. Horn, who had interviewed Trueblood prior to trial, but did not testify, and Dr. Gelbort, who interviewed Trueblood for the postconviction proceedings:

> [Trueblood] was not going to be able to think ahead, to plan out his actions, and that he would most likely respond without thinking to the feelings or thoughts of the moment.
> These neurocognitive deficits that were identified go to problem solving, reasoning ability, extrapolating and understanding.

Pet. Brief, App. 7. The Indiana Supreme Court adopted those findings, adding that Trueblood's brain damage affected:

> his ability to problem solve, reason extrapolate, and understand .... Trueblood has a problem with his visual spatial reasoning and is more distractible than normal people. Finally, ... Trueblood has trouble seeing options, difficulty weighing alternatives or options, difficulty generating alternative ideas.

715 N.E.2d at 1252. Trial counsel believed that Dr. Horn's testimony would conflict with that of Dr. Follingstad because they believed Horn's testimony would suggest he was not likely to rehabilitate, while Follingstad's testimony suggested that he would adapt well to prison. 715 N.E.2d at 1253. In postconviction proceedings, both Horn and Follingstad testified that they felt Trueblood would adapt well to prison life and that no conflict existed between their testimony. P.C.R. 3677, 3000. The Indiana Supreme Court affirmed the postconviction court's determination that trial counsel had not provided ineffective assistance on this point because counsel had made a strategic decision based on the information before them at the time. 715 N.E.2d at 1253.

Trueblood argues here that his counsel failed to conduct an inquiry into the relevance of Dr. Horn's testimony and failed to understand its import, especially in terms of its value as mitigation. He argues that the trial judge was specifically interested in Trueblood's mental status, and the failure to put Dr. Horn on the stand deprived him of testimony which might have swayed the trial court's decision in sentencing. In his supplemental brief, Trueblood argues that his counsel's failure to introduce the evidence from Dr. Horn is similar to that of the failure of Miller's counsel to introduce expert testimony on a number of subjects. However, in this case, Trueblood did present evidence regarding his mental health during the mitigation phase, just not the specific testimony which Trueblood now asserts was critical to his de-

fense. Miller's counsel completely failed to use experts on a number of topics, and on the issue of his mental health, Miller's counsel asked questions which opened up Miller's criminal history for cross-examination. *Miller,* at 459. Trueblood's counsel, though, consulted with and called to the stand a number of mental health experts. The postconviction court found the decision not to use Dr. Horn was a strategic one, and the Indiana Supreme Court agreed, finding that "on the information before it at the time, trial counsel concluded that there was a conflict between the likely testimony of Dr. Follingstad and Dr. Horn. They decided to call Follingstad and not Horn." 715 N.E.2d at 1253, fn. 14.

This court does not find the decision not to call Dr. Horn as a mitigation witness to be an example of deficient performance. While it might have been better practice to ask the doctors if a conflict existed between their testimony, the counsel did review the opinions of the doctors and the opinions of experts hired by the state to review the opinions of the doctors. *Id.* This court cannot say such efforts fell below the level of Constitutionally acceptable representation. The decision of the Indiana Supreme Court, therefore, is not an unreasonable application of *Strickland* and does not support the grant of habeas relief.

## V. Ineffective Assistance of Appellate Counsel

 Trueblood asserts that he was denied effective assistance of counsel on appeal when his counsel failed to competently challenge the sentencing judge's reliance on non-statutory aggravating circumstances and failed to competently present the mitigating effect of his guilty pleas. With respect to the non-statutory aggravating circumstance, the trial court found as an aggravating circumstance that "The murders committed by defendant were cold blooded, premeditated killings of three (3) helpless and defenseless persons." T.R. 675. At the time of Trueblood's conviction, Indiana law allowed the use of non-statutory aggravators as long as at least one statutory aggravator was found. *Minnick v. State,* 544 N.E.2d 471, 482 (Ind.1989). Trueblood's counsel did challenge this aggravator on direct appeal as not supported by the evidence, but did not challenge its use as a non-statutory aggravator. Trueblood argues now that his counsel was ineffective for failing to argue that the death penalty statute did not allow non-statutory aggravating circumstances to be used, because the *Minnick* decision was 3–2 vote, and one of the three in the majority had left the court by the time Trueblood's case was decided. Additionally, another capital defendant was able to successfully challenge the use of a non-statutory aggravator in a case heard near the same time as Trueblood. *See Bellmore v. State,* 602 N.E.2d 111, 127–29 (Ind.1992).

Trueblood also argues that his appellate counsel were ineffective for failing to challenge the failure of the trial court to consider the guilty pleas as mitigation, and for failing to preserve a proper record to provide a basis upon which the sentencing judge could have considered the guilty pleas in mitigation. Trueblood alleges that his counsel's ineffectiveness in attempting to withdraw the guilty pleas precluded them from arguing the mitigating effect of the pleas because it drew attention to their ineffectiveness.

The Indiana Supreme Court rejected these arguments on appeal from the denial of postconviction relief. 715 N.E.2d at 1257–58. It found that, although it had decided later that the use of non-statutory aggravators was inappropriate in *Bivins v. State,* 642 N.E.2d 928, 955 (Ind.1994), the holding in *Bivins* was based on state constitutional law and not statutory construc-

tion, and thus the holding was not retroactive to Trueblood's case. Additionally, the court refused to hold counsel "ineffective for failing to anticipate or effectuate a change in the existing law." 715 N.E.2d at 1258. On the mitigating effect of the guilty pleas, the court found that "it would have been highly inconsistent to argue in the same brief that the same guilty pleas that the trial court erroneously refused to vacate should also be considered as a mitigating circumstance. Although Trueblood plainly had the right to challenge the guilty peas, in doing so he refused to take responsibility for the offenses" 715 N.E.2d at 1257. The court found that the mitigating effect of a guilty plea is a fact sensitive determination, and in this case, the facts did not warrant any significant mitigating effect because Trueblood didn't plead guilty to the murders of the children until the jury had been selected and the trial begun. *Id.*

This court finds the decision of the Indiana Supreme Court on this issue to be a reasonable application of *Strickland.* Trueblood's counsel did raise the use of the non-statutory aggravator, although they did not make the statutory argument which was effective in *Bellmore.* Although it would have been better had counsel made the argument, the failure to do so does not render them ineffective. Similarly, counsel were not ineffective for failing to raise the mitigating effect of the guilty pleas. Although pleading in the alternative is acceptable, making two such inconsistent arguments as attempting to withdraw the guilty pleas and simultaneously asserting them as mitigation would not have had a beneficial effect. Counsel had already attempted to withdraw the pleas, and this court has already found that effort to not be ineffective, and arguing the guilty pleas to be mitigation would have only compounded the trial court's poor opinion of Trueblood. Thus, it was not ineffective for Trueblood's counsel to fail to assert error in the trial court's failure to consider the guilty pleas as mitigation.

## VI. Use of Invalid Aggravating Circumstances

■ Trueblood argues that he was denied his right to due process under the 14th Amendment and to a fair and reliable death sentence determination under the 8th Amendment because the trial judge found as an uncharged aggravating circumstance that "the murders committed by defendant were cold blooded, premeditated killings of three (3) helpless and defenseless persons." T.R. 675. Trueblood argues that "cold blooded," "premeditated," "helpless," and "defenseless" are as vague and overbroad as the phrases "outrageously or wantonly vile, horrible or inhuman," "heinous, atrocious, or cruel," and the "coldness" factor of "cold, calculated and premeditated," all of which have been found unconstitutional by the Supreme Court. *See Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) and *Sochor v. Florida,* 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). Under *Stringer v. Black,* "a reviewing court may not assume it would have made no difference if the thumb [of improper aggravation] had been removed from the death side of the scale." 503 U.S. at 223, 112 S.Ct. 1130.

On direct appeal, Trueblood did not challenge the use of these improper aggravating circumstances, but only the sufficiency of the evidence supporting them. The Indiana Supreme Court held that the "trial court did not find as an aggravating circumstance that the murders were cold-blooded and premeditated." 587 N.E.2d at 111. However, in a footnote, the court noted as follows:

The [trial] court did state at the sentencing hearing that the murders were cold blooded and premeditated in the context of its evaluation of the statutory mitigating circumstances. The evidence supported the trial court's statement. Trueblood told a fried a week before the murders that if he had a gun he would kill Susan, the children, and himself. Record at 1831. Trueblood took a gun from his parents' home and shortly thereafter picked up Susan and the children in his car and shot them each in the head because Susan had left him. *Id.* at 111, n. 8. When the Indiana Supreme Court reviewed the denial of Trueblood's petition for postconviction relief, it did not consider this as a free-standing claim, although it was asserted as such. It did address the issue as part of Trueblood's claim of ineffective assistance of appellate counsel, and it assumed that the phrase "cold-blooded and premeditated" was a non-statutory aggravating circumstance, but it found that Trueblood's counsel was not ineffective for failing to anticipate a later change in Indiana law outlawing the use of non-statutory aggravators. 715 N.E.2d at 1258.

Trueblood argues here that he is entitled to a reweighing of the valid aggravating circumstances against the relevant mitigating circumstances. Under *Braun v. Powell,* 227 F.3d 908, 917 (7th Cir.2000), where the state court fails to adjudicate an issue on the merits, the habeas court must "dispose of the matter as law and justice require" under 28 U.S.C. § 2243. The respondent has argued here that under *Coleman v. Ryan,* 196 F.3d 793, 796 (7th Cir., 1999), the presence of an unconstitutional aggravating factor will not disturb the sentence if an independent constitutional factor has also been found. However, *Coleman* is based on Illinois law, and in Indiana, a weighing state, the Supreme Court's holding in *Stringer* makes it clear that consideration of an unconstitutional aggravating factor by the sentencing body in a weighing state requires reweighing without the unconstitutional factor. Thus, this court finds it must grant the petition on this court to allow a reweighing of the appropriate aggravating factors.

## VII. Failure to Consider Mitigating Circumstances

■ Finally, Trueblood argues that he was denied his right to a fair and reliable determination of his death sentence under the 8th and 14th Amendments because (1) the trial judge misunderstood the appropriate standard for determining the existence of the statutory mitigating circumstance in IND.CODE 35–50–2–9(c)(2); (2) the trial judge failed to even consider numerous mitigating circumstances supported by the record; and (3) the Indiana Supreme Court failed to apply the correct federal constitutional standard in its direct review of the trial judge's failure to consider mitigating circumstances supported by the record. In the sentencing order, the trial court stated "[t]here is nothing in the record to indicate defendant was under the influence of any mental, physical or emotional disturbance when he committed the murders." T.R. 675. Trueblood asserts, though, that there was evidence on the record that he was depressed and possibly suicidal at the time of the offense and that he had a mixed personality disorder with borderline and anti-social personality traits. Trueblood argues that the trial court was focused on a different statutory mitigator dealing with mental health, specifically IND.CODE 35–50–2–9(c)(6), and did not consider the mental health evidence in the proper context. Trueblood also complains that the trial court did not appear to consider evidence that he had saved a woman from a burning building or that he had a good record of conduct while in jail. Finally, he alleges that the Indiana Supreme Court did not address his argument

that the trial court had failed to consider his mitigating evidence when they held that the mitigating evidence did not compel a finding of mitigation.

On direct appeal, the Indiana Supreme Court held that the trial court had not "erred in finding that Trueblood was not suffering from extreme mental or emotional disturbance when the murders were committed," found that the evidence of his good conduct in jail did not "compel a finding of good behavior as mitigation," and found that the "trial court did not err in failing to find" the evidence of his heroism in saving the woman from the burning building "as a mitigating circumstance." Respondent first argues that Trueblood has procedurally defaulted this issue because he did not raise it as a federal constitutional issue. However, a review of Trueblood's brief on appeal makes it clear that Trueblood did cite the Eighth Amendment to the United States Constitution and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) in his brief to the Indiana Supreme Court, sufficient to raise the issue in a federal light, and thus there has been no default. Respondent also asserts that the Indiana Supreme Court properly rejected Trueblood's claims of mitigation as unsupported by the record.

In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court applied the rule it had announced in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and held that a sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence" when contemplating a sentence of death. 455 U.S. at 114, 102 S.Ct. 869. It then remanded the case with the instruction that the state court "must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Id.* at 117, 102 S.Ct. 869.

Trueblood argues that the trial court failed to consider relevant mitigating evidence in determining his sentence. It is clear that the trial court had heard all of the evidence alleged to be mitigating during the course of the sentencing proceedings. There is no requirement that the trial court list all of the items of mitigation it has considered and rejected. The Indiana Supreme Court determined that the items alleged by Trueblood did not compel findings of mitigation, implicitly affirming the trial court's decision to reject those proffers of mitigation evidence. This court does not find the decision of the Indiana Supreme Court to be an unreasonable application of or contrary to Supreme Court precedent. *Eddings* does not require the court to list every item of mitigation evidence proffered; it requires the state court to "consider all relevant mitigating evidence." 455 U.S. at 117, 102 S.Ct. 869. The trial court apparently found the proffered evidence to be irrelevant and thus did not discuss it, the Indiana Supreme Court affirmed that decision, and this court finds that decision to be within the bounds of Supreme Court precedent. Thus, this claim must be rejected.

## VIII. Conclusion

For the reasons stated above, the court now **GRANTS** the petition with respect to Grounds One, Two, and Four, and **DENIES** the petition with respect to Grounds Three, Five, Six, and Seven. The Great Writ is now **GRANTED** conditioned upon the release of Trueblood or retrial within 120 days.

**IT IS SO ORDERED.**